## UNITED STATES DISTRICT COURT
## DISTRICT OF DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ICON INTERNATIONAL, INC.**<br>**107 Elm Street**<br>**Four Stamford Plaza**<br>**Stamford, CT 06902,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| V. | : | |
| | : | **Case No.** _____ |
| **DAVID A. STEINBERG,** | : | |
| **ANDREW ZEINFELD and** | : | |
| **KENNETH D. SCHWARZ** | : | |
| **c/o InPhonic, Inc.** | : | |
| **1010 Wisconsin Avenue, NW** | : | |
| **Suite 600** | : | |
| **Washington, DC 20007** | : | |
| | : | |
| **Defendants.** | : | |

### COMPLAINT

Plaintiff, Icon International, Inc., for its complaint against Defendants David A. Steinberg, Andrew Zeinfeld, and Kenneth D. Schwarz, states as follows:

### PARTIES

1.     The Plaintiff, Icon International, Inc. ("Icon") is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Stamford, Connecticut.

2.     The Defendant, David A. Steinberg ("Steinberg"), is an individual who is, on information and belief, a citizen of the District of Columbia. At all relevant times, Steinberg was an officer and/or director of InPhonic, Inc. ("InPhonic"), with the authority to act on behalf of InPhonic.

3.      The Defendant, Andrew Zeinfeld ("Zeinfeld") is an individual who is, on information and belief, a citizen of the Commonwealth of Virginia.  At all relevant times, Zeinfeld was an officer and/or director of InPhonic, with the authority to act on behalf of InPhonic.

4.      The Defendant, Kenneth D. Schwarz, is an individual is, on information and belief, a citizen of the Commonwealth of Virginia.  At all relevant times, Schwarz was an officer and/or director of InPhonic, with the authority to act on behalf of InPhonic.

5.      Inphonic is not a party to this civil action.  It is a Delaware corporation with its principal place of business at 1010 Wisconsin Avenue NW, Washington, D.C.  Substantially all of the acts of the Defendants which form the basis of this civil action occurred in Washington, D.C.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

7.      Venue is proper in the District of the District of Columbia pursuant to 28 U.S.C. § 1391 because a Defendant resides in the District and a substantial part of the events or omissions giving rise to these claims occurred in the District.

## ICON'S BUSINESS

8.      Icon is a specialty finance firm engaged in corporate barter.  Through its corporate barter services, Icon provides its clients with an efficient means to dispose of surplus inventory, real estate, receivables and other surplus, obsolete, or unwanted assets for prices higher than they would otherwise obtain through liquidation and traditional cash transactions.

2

9. Icon offers two primary forms of corporate barter transactions: (i) trade credit transactions and (ii) "cash" transactions involving vendor subscription agreements ("VSAs").

10. In a typical barter transaction involving trade credits, Icon's client will exchange a non-monetary asset such as inventory or real estate for trade credits in a specific dollar amount. Upon issuance of the trade credits, Icon becomes the owner of the asset. Typically, Icon immediately sells the asset. The trade credits are used by client to purchase "fulfillment" from Icon (such as media advertising, travel and printing services) in exchange for trade and cash credits.

11. In a typical VSA transaction, Icon pays an agreed-upon cash amount for the client's unwanted asset. The cash payment is far in excess of the fair market value of the asset. In exchange, the client commits to a corresponding obligation to purchase fulfillment from Icon over a fixed period of time. Icon's purchase of the client's asset is memorialized in a Purchase Agreement, and the client's corresponding obligation to purchase fulfillment from Icon is memorialized in a VSA.

12. In a VSA transaction, the client also commits to pay a guaranteed minimum amount of cash at the end of the fixed period of time if the obligation to purchase fulfillment is not completely satisfied. Under the terms of a VSA, this minimum payment guarantee is reduced by the client's purchase of fulfillment from Icon on a proportional basis using an agreed-upon percentage (the "Minimum Credit Ratio"). Because Icon assumes a financial risk in a VSA transaction by paying cash for the client's asset before the client satisfies its corresponding obligation to purchase fulfillment from Icon, VSA transactions are only available to clients who are deemed to be good credit risks and have high annual expenditures for media.

## THE INPHONIC BARTER DEAL

13.    InPhonic is an on-line seller of wireless services and products, including cellular telephones.

14.    In late April, 2006, Zeinfeld joined InPhonic as President of its e-commerce unit. Prior to joining InPhonic, Zeinfeld worked for Radio Shack, and was involved in a couple of corporate barter transactions with Icon while working for that company.

15.    Shortly after joining InPhonic, Zeinfeld became aware that InPhonic had significant excess inventory in the form of new and refurbished cell phones. In early May, 2006, he approached Icon about a potential corporate barter deal involving InPhonic's excess cell phone inventory.

16.    Representatives of Icon met with representatives of InPhonic on May 2, 2006 to discuss a possible barter deal. Both before and at that meeting, Zeinfeld explained that InPhonic's business model called for internet/online advertising, and that any barter transaction with Icon would have to involve Icon's purchase of fulfillment in the form of online media advertising. Zeinfeld and other InPhonic representatives also represented that InPhonic had an annual budget for online media advertising of approximately $100 million.

17.    At the May 2, 2006 meeting, Zeinfeld advised Icon's representatives that he was primarily interested in a cash (VSA) transaction. He explained that cash was very important to InPhonic and that it was important to close a cash transaction with Icon before the end of the second quarter (i.e. by June 30, 2006) for financial reporting reasons.

18.    Between May 2, 2006 and June 30, 2006, representatives of Icon and representatives of InPhonic negotiated the terms of the proposed barter deal. Zeinfeld headed up the InPhonic team and, was intimately involved in all aspects of the negotiations.

19.    The barter transaction between Icon and InPhonic eventually took the form of both a VSA transaction (involving InPhonic's excess inventory of cell phones valued at $4.0 million) and a trade credit transaction (involving InPhonic's excess cell phone inventory valued at $1,497,000). Both of these transactions closed on June 30, 2006. That same day, Icon sold the entire cell phone inventory purchased from InPhonic (comprised of the inventory purchased for $4.0 million in cash and the inventory purchased for $1,497,000 in trade credits) to a company known as Elephant Group, Inc. for $900,000.

20.    In the VSA transaction, Icon purchased from InPhonic substantial surplus inventory consisting of 42,862 new and refurbished cell phones. Icon purchased InPhonic's surplus inventory of cell phones for their book or extended cost value of $4.0 million, an amount substantially in excess of the liquidation or fair market value of the cell phone inventory. In consideration of Icon's agreement to purchase InPhonic's surplus inventory, InPhonic agreed to purchase a sufficient amount of media advertising from Icon to guarantee a minimum cash return to Icon of $4,550,000, payable in two installments on December 31, 2006 and March 31, 2007.

21.    The "front end" of the VSA transaction (Icon's purchase of InPhonic's surplus inventory) is memorialized in a Purchase Agreement dated June 30, 2006. A copy of the Purchase Agreement is attached hereto as Exhibit A. Pursuant to the terms of the Purchase Agreement, Icon paid funds totaling $4.0 million to InPhonic by wire transfer on June 30, 2006.

22.    The "back end" of the VSA transaction (InPhonic's promise to repay Icon through the purchase of media advertising or cash) is memorialized in a VSA dated June 30, 2006. A copy of the VSA is attached hereto as Exhibit B. Under the terms of the VSA, InPhonic agreed to pay Icon "Guaranteed Minimum Payments" as follows: (a) $3,500,000 on December 31, 2006; and (b) $1,050,000 on March 31, 2007. These Guaranteed Minimum Payments (which

were to be made in cash) could be reduced by the purchase of Media Advertising. The Media Advertising purchase by InPhonic would generate "Guaranteed Minimum Credits" which are credited toward the Guaranteed Minimum Payments.

23.    The "Guaranteed Minimum Credits" generated by the purchase of Media Advertising represent a percentage of the total amount actually paid by InPhonic for the Media Advertising. For example, if InPhonic purchased Media Advertising totaling $100,000, with an agreed-upon "Minimum Credit Ratio" of 20%, $20,000 in "Guaranteed Minimum Credits" would be generated (20% of the amount of Media Advertising purchased). Thus, by purchasing $100,000 in Media Advertising, InPhonic would be able to reduce its Guaranteed Minimum Payment obligation to Icon by $20,000.

24.    In order to satisfy its Guaranteed Minimum Payment obligations under the VSA, InPhonic would have to purchase tens of millions of dollars of media advertising from Icon. For example, at a minimum credit ratio of 20%, InPhonic would have to purchase $17,500,000 of media advertising from Icon to satisfy its Guaranteed Minimum Payment obligation due on December 31, 2006, and another $5,250,000 to satisfy its Guaranteed Minimum Payment due on March 31, 2007.

## THE SCHEME TO DEFRAUD

25.    Zeinfeld and Steinberg participated in a scheme and plan to defraud Icon of the $4.0 million in cash paid to InPhonic in connection with the VSA transaction by intentionally or recklessly misrepresenting InPhonic's ability and intent to perform its obligations under the VSA. Despite their false representations concerning InPhonic's ability and intent to purchase millions of dollars of online Media Advertising from Icon, Zeinfeld and Steinberg were, on information and belief, solely and exclusively motivated to enter into the VSA transaction by

their desire to bring an additional $4.0 million in cash into the company's coffers before the end of the second quarter of 2006 in order to show an improvement in the company's financial condition for the benefit of the company's investors and private lenders.

26.    In negotiating and authorizing the VSA transaction, Zeinfeld represented that InPhonic had the ability to purchase in excess of $20 million in online Media Advertising from Icon, and the intention to do so. In addition, Zeinfeld represented that, in the event that InPhonic failed to purchase sufficient quantities of Media Advertising from Icon, InPhonic would make the Minimum Payments due on December 31, 2006 and March 31, 2007. These representations by Zeinfeld were knowingly or recklessly false, were material, were made for the purpose of inducing Icon to enter into the VSA transaction and, in fact, induced Icon to enter into the VSA transaction.

27.    By signing the Purchase Agreement and the VSA on behalf of InPhonic, Steinberg represented that InPhonic had the ability to purchase in excess of $20 million in online Media Advertising from Icon, and the intention to do so. In addition, by signing the Purchase Agreement and the VSA, Steinberg represented that, in the event that InPhonic failed to purchase sufficient quantities of Media Advertising from Icon, InPhonic would make the Minimum Payments due under the terms of the VSA on December 31, 2006 and March 31, 2007. These representations by Steinberg were knowingly or recklessly false, were material, were made for the purpose of inducing Icon to enter into the VSA transaction and, in fact, induced Icon to enter into the VSA transaction.

## INPHONIC BREACHES THE VSA

28.    Despite Icon's repeated efforts, InPhonic made no online Media Advertising buys from Icon in 2006. In fact, InPhonic never even requested that Icon place any online Media

Advertising for it in 2006. Contrary to its representation that it intended to purchase millions of dollars of online Media Advertising from Icon during the last six months of 2006, InPhonic placed only approximately $300,000 in broadcast media (local and national radio and television broadcast tests) with Icon in 2006.

29.    Because it had failed to purchase sufficient quantities of online Media Advertising from Icon, InPhonic was required under the terms of the VSA to make a Minimum Payment in the amount of $3,459,324.95 to Icon on December 31, 2006.

30.    InPhonic failed to pay the Minimum Payment of $3,459,324.95 to Icon when due.

31.    By letter dated January 2, 2007, (the "Demand Letter"), Icon notified InPhonic that, unless InPhonic paid the Minimum Payment due on December 31, 2006 on or before January 17, 2007, InPhonic would be in default of the VSA, and that all amounts due thereunder (including the $1,050,000.00 Guaranteed Minimum Payment otherwise due on March 31, 2007) would immediately be due and payable.

**THE ARBITRATION, SETTLEMENT AND SOLVENCY MISREPRESENTATIONS**

32.    By a demand for arbitration dated January 18, 2007, Icon commenced arbitration proceedings against InPhonic pursuant to the terms of the VSA.

33.    On August 24, 2007, three days before hearings on Icon's arbitration claim were scheduled to begin, Icon and InPhonic agreed to settle Icon's claim under the VSA. The settlement terms are set forth in a Settlement Agreement dated August 24, 2007. Steinberg signed the Settlement Agreement on behalf of InPhonic.

34.    By signing the Settlement Agreement, Steinberg represented and warranted that "[b]oth before and after giving effect to the transactions contemplated by this Agreement, InPhonic's assets have a fair market value in excess of its total liabilities, it has sufficient current

assets to pay its current liabilities as they become due and matured, and it has, and presently expects that it will continue to have, access to adequate capital for the conduct of its business." Settlement Agreement, ¶8(a)(iv).    These representations by Steinberg were knowingly or recklessly false, were material, were made for the purpose of inducing Icon to enter into the Settlement Agreement and did, in fact, induce Icon to enter into the Settlement Agreement.

35.    Pursuant to the provisions of Section 5 of the Settlement Agreement, InPhonic provided a written acknowledgement (the "Officer's Acknowledgment") signed by its Chief Executive Officer and its Chief Financial Officer that, as of August 24, 2007, no bankruptcy filing or similar proceeding was contemplated by InPhonic.  On information and belief, the representation made by Steinberg and Schwarz in the Officer's Acknowledgment was knowingly or recklessly false, was material, was made for the purpose of inducing Icon to enter into the Settlement Agreement, and did, in fact, induce Icon to enter into the Settlement Agreement.

36.    On November 8, 2007, InPhonic filed for protection under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware, and was assigned case number 07-11666 (jointly administered).

## COUNT I: FRAUD – The VSA Transaction

37.    Icon incorporates paragraphs 1 through 34 as if fully set forth herein.

38.    Zeinfeld and Steinberg knew, or should have known, that Icon relied on their false and misleading representations regarding InPhonic's intent and ability to fulfill its obligations under the VSA.

39.    The Defendants intentionally misrepresented InPhonic's intentions and its ability to fulfill its obligation under the VSA in an effort to induce Icon to enter into the VSA transaction with InPhonic.

40.    Icon reasonably relied on the Defendants' misrepresentations, and but for the misrepresentations, would not have entered into the VSA transaction with InPhonic.

41.    As a direct and proximate result of the Defendants' actions and conduct, Icon has been damaged.

42.    As a result of the Defendants' fraud, Icon is also entitled to punitive damages and attorney's fees and costs.

### COUNT II:  Negligent Misrepresentation – The VSA Transaction

43.    Icon incorporates paragraphs 1 through 40 as if fully set forth herein.

44.    Zeinfeld and Steinberg knew, or should have known, that Icon relied on their representations regarding InPhonic's intent and ability to fulfill its obligations under the VSA.

45.    Icon reasonably relied on the Defendants' representations.

46.    As a direct and proximate result of the Defendants' conduct, Icon has been damaged.

### COUNT III:  Fraud – The Settlement Agreement

47.    Icon incorporates paragraphs 1 through 44 as if fully set forth herein.

48.    Steinberg and Schwartz knew, or should have known, that Icon relied on their false and misleading representations concerning InPhonic's solvency and its plans with respect to a bankruptcy filing when it entered into the Settlement Agreement.

49.    The Defendants intentionally misrepresented InPhonic's solvency and its plans with respect to a bankruptcy filing in order to induce Icon to enter into the Settlement Agreement.

50.    Icon reasonably relied on the Defendants' misrepresentations and, but for the misrepresentations, would not have entered into the Settlement Agreement.

51.    As a direct and proximate result of the Defendants' actions and conduct, Icon has been damaged.

52.    As a result of the Defendants' fraud, Icon is entitled to punitive damages and attorneys' fees.

### COUNT IV:  Negligent Representation – The Settlement Agreement

53.    Icon incorporates paragraphs 1 through 50 as if fully set forth herein.

54.    Steinberg and Schwarz knew, or should have known, that Icon relied on their representations concerning InPhonic's solvency and its plans with respect to a bankruptcy filing when it entered into the Settlement Agreement.

55.    Icon reasonably relied on the Defendants' representations.

56.    As a direct and proximate result of the Defendants' conduct, Icon has been damaged.

### PRAYER FOR RELIEF

Wherefore, Icon requests the following relief:

1.    A judgment for damages in an amount in excess of $5,000,000.00, together with prejudgment interest, punitive damages, attorneys' fees and costs;

2.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, Icon International, Inc. demands a trial by jury on all issues raised in this Complaint for which a jury trial is available.

Dated: December 31, 2007

Respectfully submitted,

THE PLAINTIFF,
ICON INTERNATIONAL, INC.

By _____

Haig V. Kalbian [D.C. Bar # 400976]
Aaron W. Knights [D.C. Bar #489555]
KALBIAN HAGERTY, L.L.P.
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
hkalbian@kalbianhagerty.com
aknights@kalbianhagerty.com
T: (202) 223-5600
F: (202) 223-6625

Of Counsel:        Thomas W. Witherington
                   Scott D. Rosen
                   COHN, BIRNBAUM & SHEA P.C.
                   100 Pearl Street
                   Hartford, CT 06103
                   Phone: (860) 493-2200
                   Fax: (860) 727-0361

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

### I. (a) PLAINTIFFS

ICON INTERNATIONAL, INC.
107 ELM STREET
FOUR STAMFORD PLAZA
STAMFORD, CT 06902

### DEFENDANTS

DAVID A. STEINBERG, ANDREW ZEINFELD and KENNETH D. SCHWARZ
C/o INPHONIC, INC.
1010 WISCONSIN AVENUE, N.W., Suite 600
WASHINGTON D.C. 20007

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    **88888**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    **11001**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

HAIG V. KALBIAN, ESQ.
KALBIAN HAGERTY, LLP
888 17TH STREET, N.W., SUITE 1000
WASHINGTON D.C. 20006
TEL: (202) 223-5600

ATTORNEYS (IF KNOWN)

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 2 U.S. Government
Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 4 Diversity
(Indicate Citizenship of
Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ◉ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency
Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

**○ D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

**◉ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☒ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** <br> (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** <br> (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** <br> (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** <br> (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. § 1332 - Fraud and Negligent Misrepresentation and Representation

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  **DEMAND $** 5,000,000.00  Check YES only if demanded in complaint  **JURY DEMAND:** YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

**DATE** 12/31/07  **SIGNATURE OF ATTORNEY OF RECORD** _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

  I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

  III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

  IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

  VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

  VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT A

PURCHASE AGREEMENT

This agreement (the "Agreement"), dated as of June 30, 2006, is made by and between InPhonic, Inc. ("InPhonic"), a Delaware corporation, having offices at 1010 Wisconsin Avenue, NW, Suite 600, Washington, DC 20007 and Icon International, Inc. ("Icon"), a Connecticut corporation, having offices at 107 Elm Street/Four Stamford Plaza, Stamford, CT 06902.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending legally and equitably to be bound, hereby agree as follows:

1. Creation of Trade Credits: Purchase Price

1.1     On the date hereof (the "Closing"), InPhonic hereby agrees to sell and transfer title to Icon and Icon hereby agrees to purchase and accept title to the products set forth in Exhibit 1.1 (the "Products") for the consideration set forth in Paragraph 1.2 below.

1.2     As full consideration for the Products, Icon hereby agrees to pay to InPhonic $4,000,000.00, in cash, by wire transfer to the following account upon Closing:

> Bank: Comerica Bank
> Address: 226 Airport Parkway
> San Jose, CA 95110
> Routing: 121137522
> Account No.: 1891668467
> Name: InPhonic, Inc.

2.     Upon request from Icon following the Closing, InPhonic shall ship the Products insurance and freight prepaid by Icon or its designees, to designees Icon shall hereafter advise from time to time, it being understood that Icon may direct such shipments to any person or company at any location, worldwide. Icon's rights of resale or distribution shall be unrestricted and require no approval by InPhonic or any other party prior to sale. Upon Closing, the Products shall be segregated from other InPhonic inventory and marked in Icon's name and shall be stored and fully insured by InPhonic for Icon's benefit at no expense to Icon. Icon shall contact Andrew Zeinfeld of InPhonic at (202) 333-0001 for all inquiries regarding the Products.

3.     While InPhonic is in possession of the Products, notwithstanding that Icon owns the Products, InPhonic agrees to maintain all risks insurance until Icon (or its designees) take physical possession of the Products and agrees to name Icon or its assigns as insured parties for the value of this Agreement.

4.     This Agreement does not in any way create the relationship of principal and agent between InPhonic and Icon. Icon shall not act or attempt to act, or represent itself directly or by implication, as agent of InPhonic or in any manner assume or create, or attempt to assume or create, any obligation on behalf of or in the name of InPhonic and will not make any representations, on behalf of or in the name of InPhonic, with respect to the Products, except such as may be expressly authorized by InPhonic in writing, or as set forth in literature prepared or authorized by InPhonic.

5. Representations and Warranties: Indemnification: Penalty

5.1     InPhonic represents and warrants that: (i) it is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation; (ii) it has full power and authority to enter

into and perform this Agreement in accordance with its terms; (iii) the execution, delivery and performance of this Agreement by InPhonic have been duly authorized by all requisite corporate action of InPhonic; (iv) this Agreement is a valid and binding obligation of InPhonic, enforceable in accordance with its terms; and (v) it has transferred to Icon good and marketable title to the Products, free and clear of all claims, liens or encumbrances and subject only to the terms and conditions of this Agreement.

5.2    InPhonic further represents and warrants that: (i) all of the Products, whether new, refurbished or customer returns, are fully packaged as is customary, contain all component parts, are in merchantable condition, and carry their normal warranty in favor of the eventual purchasers; (ii) the sale or distribution of the Products does not require qualification thereof or by Icon with any Federal, State or administrative agency or otherwise; and (iii) there are no restrictions on the resale of the Products by any party. Icon acknowledges and agrees that with respect to any warranty of fitness for a particular purpose or intended use, InPhonic's warranty is limited to the warranty provided by the manufacturer of the Products, if any. InPhonic will furnish Icon without charge the original packaging and accompanying booklets, sheets and other sales promotional material shipped with the Products by the original equipment manufacturer that describes the Products.

5.3    Icon represents and warrants that: (i) it is a corporation duly organized, validly existing and in good standing under the laws of the state of Connecticut; (ii) it has full power and authority to enter into and perform this Agreement in accordance with its terms; (iii) the execution, delivery and performance of this Agreement by Icon have been duly authorized by all requisite corporate action of Icon; and (iv) this Agreement is a valid and binding obligation of Icon, enforceable in accordance with its terms.

5.4    Each party shall indemnify and hold the other party harmless from and against any and all damages, liabilities, costs and expenses (including reasonable attorney's fees) arising from or relating to such party's breach of any of its obligations pursuant to this Agreement or the representations or warranties set forth herein. Each party shall (i) defend at its own cost and through counsel of its own choice or (ii) settle, subject to the approval of the other party, such approval not be unreasonably conditioned, withheld or delayed: any actions or suit against the other for which it is responsible hereunder and shall reimburse the other for reasonable attorney's fees, interest, costs of suit and all other expenses by the other in connection therewith. Each party shall notify the other promptly of any claim for which the other is responsible hereunder, and shall cooperate with the other in every reasonable way to facilitate the defense of any such claim. The indemnifying party's obligations are conditioned upon the indemnified party (i) providing the indemnifying party with prompt written notice of any claim, suit or proceeding for which the indemnified party is seeking indemnity and (ii) reasonably cooperating with the defense or settlement negotiations, as the case may be, conducted by the indemnifying party.

5.5    In no event shall either party be liable to the other under this Agreement for consequential, exemplary, special, incidental, or punitive damages.

5.6    In the event less than 12,000 units of the Products (as defined in this Agreement and that certain Straight Trade Credit Agreement, by and between the parties hereto, of even date herewith (collectively, the "Aggregate Products")), constitute new cellular telephones, within ten (10) business days of receipt of invoice from Icon, InPhonic will pay to Icon an amount, in cash, equal to: (i) 12,000; reduced by (ii) the portion of the Aggregate Products that constitute new cellular telephones; multiplied by (iii) $25.00. In addition, in the event less than 13,000 units of the Aggregate Products, constitute refurbished cellular telephones, within ten (10) business days of receipt of invoice from Icon, InPhonic will pay to Icon an amount, in cash, equal to: (i) 13,000; reduced by (ii) the portion of the Aggregate Products that constitute refurbished cellular telephones; multiplied by (iii) $15.00.

## 6. Miscellaneous

6.1    This Agreement contains a complete statement of all arrangements between the parties with respect to its subject matter, and cannot be changed or terminated orally. No modification or waiver of this Agreement shall be binding unless such modification or waiver is set forth in a writing that is signed by the Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly provided otherwise. There are no representations, warranties, or arrangements other than those set forth within this Agreement or any Exhibit attached hereto.

6.2    All notices and other communications under this Agreement shall be in writing and shall be considered given when (i) delivered by hand against receipt or (ii) one (1) day following deposit with an overnight courier that keeps written records of its deliveries; or (iii) three (3) days following deposit as certified mail, return receipt requested, addressed to the party at the following addresses (or at such other address as a party may designate by notice to the other).

If to InPhonic:          InPhonic, Inc.
                         1010 Wisconsin Avenue, NW, Suite 600
                         Washington, DC 20007
                         Attention: Mr. Andrew Zeinfeld, President, E-Commerce

If to Icon:              Icon International, Inc.
                         107 Elm Street
                         Four Stamford Plaza/15th Floor
                         Stamford, CT 06902
                         Attention: Mr. John Kramer, President

6.3    This Agreement shall be governed by and construed in accordance with the laws of the state of New York applicable to agreements made and to be performed in New York. Any dispute or controversy arising under or in connection with this agreement shall be settled by arbitration to be held in the City of New York in accordance with the rules of the American Arbitration Association then in effect. Judgment may be entered on the arbitrator's award in any court having jurisdiction, and the parties consent to the jurisdiction of the New York courts for this purpose. The Arbitration shall interpret the Agreement as drafted, and only in the event of silence, look to the laws of New York. The costs of arbitration shall be shared equally by the parties. Each party will pay its own attorneys' fees and costs.

6.4    The provisions set forth in any Exhibit hereto or other attachment to this Agreement are hereby incorporated herein as if fully set forth herein and to the extent of any conflict between the provisions of this Agreement and any Exhibit or attachment hereto, the provisions of this Agreement shall govern.

6.5    Both InPhonic and Icon acknowledge that during the term of this Agreement, each party may obtain access to information considered confidential by the other party, including, but not limited to, proprietary information, trade secrets, customer lists, media information, media pricing and financial information (the "Confidential Information") of the other party. The parties acknowledge that each party would be irreparably damaged by the disclosure of the Confidential Information to others. Therefore, the parties agree to keep secret and confidential and not to disclose the Confidential Information of each other without the prior written consent of the other party. The parties' agreement not to disclose the

3

Confidential Information shall survive the expiration of this Agreement.

6.6    Press Releases. Except as required by law, neither party shall issue a press release or make a public announcement concerning the other party or this Agreement without first obtaining the prior written consent of such party.

6.7    Assignment. Neither of the parties may, without the other parties' prior written consent, which shall not be unreasonably withheld, assign or transfer this Agreement, or any of its rights or obligations under this Agreement to any person ("Assignee"), except as part of the sale of all or substantially all of the assets of the party or merger of the party; provided, however, that the Assignee agrees to fully perform and be bound by the provisions of this Agreement.

6.8    Invalidity. In the event that any one or more of the provisions contained herein or in any instrument referred to herein shall, for any reason, be held to be invalid, illegal or unenforceable, then to the maximum extent permitted by law, such provision or provisions shall be judicially reformed consistent with the parties' intentions so as to be valid, legal and enforceable, and such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or such other instrument.

6.9    Expenses. Except as otherwise provided herein, each party shall pay its own legal, accounting, out-of-pocket and other expenses incident to this Agreement and to any action taken by such party in preparation for performing its obligations under this Agreement.

6.10    This Agreement may be executed by fax and in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

Agreed to:

InPhonic, Inc.

By
Name: David Steinberg
Title: CEO

Icon International, Inc.

By: 
Name: Clarence V. Lee III
Title: EVP/CFO

4

## EXHIBIT 1.1

## THE PRODUCTS

**Subscriber Equipment**

| Carrier & Model / Product Description | Units | Ext. Value |
|---|---|---|
| 2.5mm Short Boom wired headset | 1,293 | $ 1,616.25 |
| ALLTEL Wireless - Audiovox 8910 (Camera Phone) | 30 | $ 4,662.18 |
| ALLTEL Wireless - Kyocera 3250 | 3 | $ 330.00 |
| ALLTEL Wireless - Kyocera 5135 Phone | 48 | $ 7,298.05 |
| ALLTEL Wireless - Kyocera 7135 | 26 | $ 7,930.00 |
| ALLTEL Wireless - Kyocera KX1 SoHo | 12 | $ 1,620.00 |
| ALLTEL Wireless - Kyocera SE44 Slider | 45 | $ 6,641.72 |
| ALLTEL Wireless - LG 5450 (Camera Phone) | 17 | $ 4,120.67 |
| ALLTEL Wireless - LG AX4750 | 13 | $ 2,695.00 |
| ALLTEL Wireless - LG LX5350 | 53 | $ 9,540.00 |
| ALLTEL Wireless - LG VX3100 | 50 | $ 6,913.25 |
| ALLTEL Wireless - LG VX3200 | 10 | $ 1,392.00 |
| ALLTEL Wireless - Motorola RAZR V3c (Camera Phone) | 1 | $ 349.00 |
| ALLTEL Wireless - Motorola T720 | 143 | $ 21,608.23 |
| ALLTEL Wireless - Motorola V120e | 34 | $ 5,396.84 |
| ALLTEL Wireless - Motorola V120x | 28 | $ 2,589.88 |
| ALLTEL Wireless - Motorola V262 | 11 | $ 1,672.00 |
| ALLTEL Wireless - Motorola V265 (Camera Phone) | 21 | $ 4,137.20 |
| ALLTEL Wireless - Motorola V60i | 24 | $ 4,608.00 |
| ALLTEL Wireless - Motorola V60x | 244 | $ 34,160.00 |
| ALLTEL Wireless - Motorola V710 (Camera Phone) | 6 | $ 1,078.18 |
| ALLTEL Wireless - Nokia 3585i | 339 | $ 37,331.87 |
| ALLTEL Wireless - Nokia 3587i | 59 | $ 6,699.00 |
| ALLTEL Wireless - Nokia 6255i (Video Phone) | 53 | $ 12,429.04 |
| AT&T Wireless - Audiovox SMT5600 (Camera Phone) | 3 | $ 915.00 |
| AT&T Wireless - LG L1150 (Camera Phone) | 4 | $ 720.00 |
| AT&T Wireless - Motorola MPx200 | 4 | $ 1,296.00 |
| AT&T Wireless - Motorola T721 | 2 | $ 259.00 |
| AT&T Wireless - Motorola V120t | 1 | $ 99.00 |
| AT&T Wireless - Motorola V180 | 1 | $ 125.00 |
| AT&T Wireless - Motorola V220 (Camera Phone) | 30 | $ 4,680.00 |
| AT&T Wireless - Motorola V505 (Camera Phone) | 17 | $ 3,400.00 |
| AT&T Wireless - Motorola V551 (Camera Phone) | 2 | $ 384.00 |
| AT&T Wireless - Motorola V60t | 3 | $ 599.97 |
| AT&T Wireless - Nokia 1260 | 4 | $ 216.39 |
| AT&T Wireless - Nokia 2260 | 10 | $ 907.50 |
| AT&T Wireless - Nokia 3100 | 2 | $ 160.00 |
| AT&T Wireless - Nokia 3200 (Camera Phone) | 4 | $ 620.00 |
| AT&T Wireless - Nokia 3560 | 5 | $ 555.00 |
| AT&T Wireless - Nokia 3560 | 2 | $ 265.00 |
| AT&T Wireless - Nokia 3595 | 3 | $ 375.00 |
| AT&T Wireless - Nokia 6010 | 88 | $ 7,036.92 |
| AT&T Wireless - Nokia 6620 (Video Phone) | 2 | $ 806.00 |
| AT&T Wireless - Nokia 6820 (Camera Phone) | 2 | $ 500.00 |
| AT&T Wireless - Samsung E316 (Camera Phone) | 10 | $ 2,230.00 |
| AT&T Wireless - Samsung SGH-X426 | 2 | $ 250.00 |
| AT&T Wireless - Sony Ericsson T228 | 4 | $ 448.77 |
| AT&T Wireless - Sony Ericsson T637 (Camera Phone) | 2 | $ 420.00 |
| Cellular One - Audiovox 8910 (Camera Phone) | 5 | $ 775.00 |
| Cellular One - Kyocera 5135 Phone | 47 | $ 7,144.50 |
| Cellular One - Kyocera Rdiv | 11 | $ 1,165.00 |
| Cellular One - Kyocera KE414 | 42 | $ 4,719.00 |
| Cellular One - LG VX3200 | 88 | $ 12,250.00 |
| Cellular One - Motorola E310 | 12 | $ 2,508.00 |
| Cellular One - Motorola T720e | 4 | $ 656.00 |
| Cellular One - Motorola V810 (Camera Phone) | 8 | $ 2,288.00 |
| Cellular One - Nokia 3285 | 6 | $ 721.60 |
| Cellular One - Nokia 3390 | 1 | $ 80.00 |
| Cellular One - Nokia 3585i | 2 | $ 444.00 |
| Cellular One - Nokia 6255i (Video Phone) | 9 | $ 2,230.00 |

1 of 7

| Carrier & Model / Product Description | Units | Ext. Value |
|---|---|---|
| Cingular Wireless - Audiovox SMT 5800 Smartphone (Video Phone) | 18 | $ 4,528.00 |
| Cingular Wireless - Cingular 2125 (Multimedia Phone) | 1 | $ 273.00 |
| Cingular Wireless - Cingular 8125 Pocket PC (Multimedia Phone) | 2 | $ 810.00 |
| Cingular Wireless - Firefly | 9 | $ 756.00 |
| Cingular Wireless - LG A7110 (video phone) | 29 | $ 4,115.00 |
| Cingular Wireless - LG C1300 | 1 | $ 108.00 |
| Cingular Wireless - LG C1300i | 355 | $ 11,205.00 |
| Cingular Wireless - LG C1500 | 9 | $ 876.00 |
| Cingular Wireless - LG C2000 (Camera Phone) | 7 | $ 806.00 |
| Cingular Wireless - LG CG300 (Camera Phone) | 2 | $ 296.00 |
| Cingular Wireless - LG F9100 | 24 | $ 4,320.00 |
| Cingular Wireless - LG F9200 | 5 | $ 800.00 |
| Cingular Wireless - LG L1400 (Camera Phone) | 7 | $ 865.40 |
| Cingular Wireless - LG L1400i (Camera Phone) | 1 | $ 180.00 |
| Cingular Wireless - Motorola L8 | 24 | $ 4,451.60 |
| Cingular Wireless - Motorola C331g | 3 | $ 297.00 |
| Cingular Wireless - Motorola C331i | 6 | $ 732.00 |
| Cingular Wireless - Motorola C350g | 1 | $ 127.00 |
| Cingular Wireless - Motorola MPX220 (Video Phone) | 7 | $ 2,243.00 |
| Cingular Wireless - Motorola RAZR V3 | 12 | $ 2,569.82 |
| Cingular Wireless - Motorola RAZR V3 Black | 59 | $ 14,747.77 |
| Cingular Wireless - Motorola RAZR V3 Black (Camera Phone) | 136 | $ 28,172.55 |
| Cingular Wireless - Motorola RAZR V3 Pink (Camera Phone) | 94 | $ 23,382.00 |
| Cingular Wireless - Motorola ROKR with iTunes | 17 | $ 4,198.00 |
| Cingular Wireless - Motorola SLVR L7 with iTunes | 631 | $ 124,550.35 |
| Cingular Wireless - Motorola T720 | 3 | $ 807.00 |
| Cingular Wireless - Motorola V180 | 32 | $ 4,381.71 |
| Cingular Wireless - Motorola V180g (Camera Phone) | 36 | $ 3,021.00 |
| Cingular Wireless - Motorola V551 (Camera Phone) | 4 | $ 896.00 |
| Cingular Wireless - Motorola V557 (Camera Phone) | 134 | $ 18,296.15 |
| Cingular Wireless - Motorola V600 (Camera Phone) | 6 | $ 1,044.00 |
| Cingular Wireless - Motorola V60g | 1 | $ 299.00 |
| Cingular Wireless - Motorola V60s | 4 | $ 756.00 |
| Cingular Wireless - Motorola V70g | 2 | $ 497.24 |
| Cingular Wireless - Nokia 2260 | 12 | $ 4,020.00 |
| Cingular Wireless - Nokia 3100 | 2 | $ 208.00 |
| Cingular Wireless - Nokia 3220 (Video Phone) | 2 | $ 224.00 |
| Cingular Wireless - Nokia 3360 | 6 | $ 1,040.00 |
| Cingular Wireless - Nokia 3390 | 5 | $ 1,000.44 |
| Cingular Wireless - Nokia 3590 | 10 | $ 860.00 |
| Cingular Wireless - Nokia 3595 | 1 | $ 96.00 |
| Cingular Wireless - Nokia 3595 - Blue | 21 | $ 1,661.83 |
| Cingular Wireless - Nokia 6010 | 2 | $ 212.36 |
| Cingular Wireless - Nokia 6030 | 26 | $ 1,782.30 |
| Cingular Wireless - Nokia 6102 (Camera Phone) | 26 | $ 2,184.00 |
| Cingular Wireless - Nokia 6230 (Camera Phone) | 21 | $ 3,024.00 |
| Cingular Wireless - Nokia 6500 | 4 | $ 684.00 |
| Cingular Wireless - Nokia 6520 (Video Phone) | 3 | $ 492.00 |
| Cingular Wireless - Nokia 6682 (Multimedia Phone) | 5 | $ 1,040.00 |
| Cingular Wireless - Nokia 7610 (Camera Phone) | 2 | $ 616.00 |
| Cingular Wireless - Nokia 8300 (Multimedia Phone) | 1 | $ 488.00 |
| Cingular Wireless - PalmOne Treo 650 (Camera Phone) | 1 | $ 488.00 |
| Cingular Wireless - RIM BlackBerry 7100g | 1 | $ 52.00 |
| Cingular Wireless - RIM BlackBerry 7290 | 4 | $ 1,232.08 |
| Cingular Wireless - RIM BlackBerry 8700c | 4 | $ 1,432.00 |
| Cingular Wireless - Samsung D357 (Push To Talk) | 1 | $ 488.00 |
| Cingular Wireless - Samsung E357 (Camera Phone) | 6 | $ 808.00 |
| Cingular Wireless - Samsung P107 (Camera Phone) | 58 | $ 7,593.01 |
| Cingular Wireless - Samsung P777 Sider (Video Phone) | 4 | $ 823.20 |
| Cingular Wireless - Samsung S307 | 1 | $ 176.00 |

| Carrier & Model / Product Description | Units | | Ext. Value |
|---|---|---|---|
| Nextel - RIM BlackBerry 7520 | 125 | $ | 43,585.80 |
| No Carrier - Anna Sui Mobile by Samsung | 1 | $ | 299.00 |
| Other - 3-piece accessory kit – Nextel iden compatible headset and car charger, very small pouch to | 252 | $ | 1,134.00 |
| Other - 3-piece accessory kit – nokia compatible headset & car charger, large pouch for Nokia 3660 | 22 | $ | 99.00 |
| Other - 3-piece accessory kit – Samsung headset and car charger and medium pouch for Samsung | 96 | $ | 432.00 |
| Other - 3-piece accessory kit – Samsung headset and car charger and small pouch for Samsung E3 | 40 | $ | 180.00 |
| Other - Audiovox 8912 (Camera Phone) | 14 | $ | 2,226.00 |
| Other - Car charger for Motorola V180 / V220 | 51 | $ | 89.25 |
| Other - Car charger for Sony Ericsson T290 and Z502a phones | 419 | $ | 733.25 |
| Other - Data sync kit and cable for Samsung A850/A840/A920 | 130 | $ | 2,340.00 |
| Other - Data sync kit and cable for Samsung E317 | 73 | $ | 1,314.00 |
| Other - Data sync kit and cable for Sanyo phones | 52 | $ | 936.00 |
| Other - Kyocera KE424c Blade | 4 | $ | 409.69 |
| Other - Kyocera KX1 SoHo | 1 | $ | 158.89 |
| Other - Motorola CE Bus Travel Charger for V710 / E815 / V120 / V260 series / V330 / V360 | 4,796 | $ | 40,094.56 |
| Other - Motorola I605X | 1 | $ | 149.89 |
| Other - Motorola I66o | 2 | $ | 339.02 |
| Other - Motorola RAZR V3 | 1 | $ | 229.00 |
| Other - Motorola V120t | 1 | $ | 99.00 |
| Other - Motorola V190 | 1 | $ | 49.00 |
| Other - Motorola V710 (Camera Phone) | 1 | $ | 385.55 |
| Other - Motorola V810 (Camera Phone) | 1 | $ | 296.67 |
| Other - Nokia 2260 | 1 | $ | 104.00 |
| Other - Nokia 3270 | 5 | $ | 425.00 |
| Other - Nokia 3590 | 14 | $ | 1,512.00 |
| Other - Nokia 3660 | 2 | $ | 260.75 |
| Other - Nokia 3660/8010 Short Boom wired headset | 880 | $ | 1,100.00 |
| Other - Nokia 6010 | 1 | $ | 180.00 |
| Other - RIM 850-Blak | 1 | $ | 99.00 |
| Other - Sony Ericsson T290a | 1 | $ | 99.00 |
| Other - Universal canvas case, medium, swivel clip for Nokia 3220, Kyocera SE47 Slider, Nokia 623 | 797 | $ | 2,391.00 |
| Other - Universal leather pouch, horizontal fixed clip large & wide for Blackberry 7230 / 7250 / T250 / | 31 | $ | 62.00 |
| Other - Universal leather pouch, horizontal fixed clip, large for Nokia 3660 / Nokia 9300 / Nextel I285 | 358 | $ | 716.00 |
| Other - Universal leather pouch, vertical swivel clip for Motorola V250 / V330 / Nokia 6255 / / Samsun | 10,403 | $ | 77,497.59 |
| Other - Universal leather pouch, vertical swivel clip for Nextel wide phones I760 / I530 / I850 | 1,315 | $ | 2,630.00 |
| Sprint PCS - Audiovox 8912 (Camera Phone) | 12 | $ | 1,715.89 |
| Sprint PCS - Audiovox Pocket PC 5500 (Video Phone) | 1 | $ | 639.99 |
| Sprint PCS - Audiovox VI600 | 4 | $ | 599.96 |
| Sprint PCS - LG MM-535 (Multimedia Phone) | 1 | $ | 379.99 |
| Sprint PCS - LG PM-225 Red (Camera Phone) | 3 | $ | 599.97 |
| Sprint PCS - LG VI-125 | 6 | $ | 1,079.94 |
| Sprint PCS - LG VI-5225 | 29 | $ | 3,317.95 |
| Sprint PCS - Merlin G201 Wireless PC Card Modem | 1 | $ | 179.99 |
| Sprint PCS - Motorola I650 (Camera Phone) | 1 | $ | 209.99 |
| Sprint PCS - Nokia 3586I | 12 | $ | 1,049.94 |
| Sprint PCS - Nokia 6016 | 1 | $ | 149.99 |
| Sprint PCS - PalmOne Treo 650 (Camera Phone) | 1 | $ | 492.99 |
| Sprint PCS - Samsung A900 (Multimedia Phone) | 1 | $ | 349.99 |
| Sprint PCS - Samsung IP-A790 (World Phone) | 1 | $ | 549.99 |
| Sprint PCS - Samsung PM-A940 (Camera Phone) | 4 | $ | 878.96 |
| Sprint PCS - Samsung VI660 | 3 | $ | 508.98 |
| Sprint PCS - Samsung VM-A680 (Video Phone) | 1 | $ | 259.99 |
| Sprint PCS - Sanyo PM-8200 (Camera Phone) | 4 | $ | 1,019.96 |
| Sprint PCS - Sanyo SCP-200 Blue | 1 | $ | 169.99 |
| Sprint PCS - Sanyo SCP-200 Silver | 1 | $ | 169.99 |
| Sprint PCS - UT Starcom CDM-105 | 1 | $ | 149.99 |
| T-Mobile - Galaxy Johnson Mobile by Samsung | 8 | $ | 1,991.92 |
| T-Mobile - Motorola A630 (Camera Phone) | 69 | $ | 20,700.00 |
| T-Mobile - Motorola C332g | 55 | $ | 3,325.00 |
| T-Mobile - Motorola C650 (Camera Phone) | 100 | $ | 13,125.00 |
| T-Mobile - Motorola I730 | 1 | $ | 200.00 |

4 of 7

8

| Carrier & Model / Product Description | Units | Ext. Value |
|---|---|---|
| T-Mobile - Motorola PEBL (Video Phone) | 10 | $ 3,000.00 |
| T-Mobile - Motorola RAZR V3 (Camera Phone) | 125 | $ 31,384.94 |
| T-Mobile - Motorola RAZR V3 Magenta (Camera Phone) | 3 | $ 825.00 |
| T-Mobile - Motorola T720g | 5 | $ 735.00 |
| T-Mobile - Motorola T722i (Camera Phone) | 101 | $ 16,169.71 |
| T-Mobile - Motorola V180 | 79 | $ 9,480.00 |
| T-Mobile - Motorola V188 | 97 | $ 12,101.05 |
| T-Mobile - Motorola V220 (Camera Phone) | 2 | $ 240.26 |
| T-Mobile - Motorola V300 (Camera Phone) | 321 | $ 65,602.57 |
| T-Mobile - Motorola V330 (Video Phone) | 137 | $ 30,014.01 |
| T-Mobile - Motorola V360 (Video Phone) | 55 | $ 11,020.12 |
| T-Mobile - Motorola V600 (Camera Phone) | 79 | $ 23,406.05 |
| T-Mobile - Motorola V600i | 33 | $ 4,257.00 |
| T-Mobile - Motorola v66g Silver | 527 | $ 54,750.58 |
| T-Mobile - Nokia 2270 | 52 | $ 5,200.00 |
| T-Mobile - Nokia 3220 (Video Phone) | 2 | $ 354.53 |
| T-Mobile - Nokia 3360 | 92 | $ 11,960.00 |
| T-Mobile - Nokia 3595 | 39 | $ 3,526.25 |
| T-Mobile - Nokia 3595 - Blue | 280 | $ 25,676.49 |
| T-Mobile - Nokia 3650 (Camera Phone) | 36 | $ 7,840.00 |
| T-Mobile - Nokia 3650 (Camera Phone) | 25 | $ 7,500.00 |
| T-Mobile - Nokia 6010 | 507 | $ 101,592.91 |
| T-Mobile - Nokia 6101 (Camera Phone) | 347 | $ 30,616.20 |
| T-Mobile - Nokia 6102 (Camera Phone) | 91 | $ 13,849.80 |
| T-Mobile - Nokia 6600 (Video Phone) | 2 | $ 525.00 |
| T-Mobile - Nokia 6610 | 75 | $ 28,260.00 |
| T-Mobile - Nokia 6800 | 10 | $ 1,700.00 |
| T-Mobile - Nokia NGage | 405 | $ 33,605.12 |
| T-Mobile - Nokia NGage QD | 76 | $ 7,600.00 |
| T-Mobile - Pocket PC Phone Edition | 28 | $ 5,600.00 |
| T-Mobile - RIM BlackBerry 6710 | 4 | $ 1,133.33 |
| T-Mobile - RIM BlackBerry 7100t | 91 | $ 9,100.00 |
| T-Mobile - RIM BlackBerry 7105t | 36 | $ 12,350.00 |
| T-Mobile - RIM BlackBerry 7280 | 13 | $ 4,225.00 |
| T-Mobile - RIM BlackBerry 7290 | 25 | $ 7,916.67 |
| T-Mobile - Samsung C225 | 28 | $ 6,488.89 |
| T-Mobile - Samsung D415 (Camera Phone) | 122 | $ 10,980.00 |
| T-Mobile - Samsung E105 | 51 | $ 18,300.00 |
| T-Mobile - Samsung E315 (Camera Phone) | 180 | $ 27,393.10 |
| T-Mobile - Samsung E335 (Camera Phone) | 22 | $ 4,510.00 |
| T-Mobile - Samsung E635 (Camera Phone) | 155 | $ 28,125.99 |
| T-Mobile - Samsung E715 (Camera Phone) | 97 | $ 13,735.00 |
| T-Mobile - Samsung P735 (Video Phone) | 138 | $ 34,625.91 |
| T-Mobile - Samsung R225m | 120 | $ 45,227.37 |
| T-Mobile - Samsung T309 (Camera Phone) | 836 | $ 63,429.81 |
| T-Mobile - Samsung T809 (Video Phone) | 164 | $ 24,600.00 |
| T-Mobile - Samsung X105 | 2 | $ 428.57 |
| T-Mobile - Samsung X475 | 16 | $ 2,116.00 |
| T-Mobile - Samsung X495 | 15 | $ 2,250.00 |
| T-Mobile - Sharp TM150 (Video Phone) | 71 | $ 8,975.00 |
| T-Mobile - Siemens CF62T | 36 | $ 7,200.00 |
| T-Mobile - Sony Ericsson GC79 Cellular And WiFi PC Card | 32 | $ 4,410.00 |
| T-Mobile - Sony Ericsson GC89 Cellular And WiFi PC Card | 33 | $ 6,699.99 |
| T-Mobile - Sony Ericsson T300 (Camera Phone) | 3 | $ 585.00 |
| T-Mobile - Sony Ericsson T610 (Camera Phone) | 24 | $ 3,260.00 |
| T-Mobile - T-Mobile MDA | 79 | $ 14,538.00 |
| T-Mobile - T-Mobile Sidekick - Color | 1 | $ 425.00 |
| T-Mobile - T-Mobile Sidekick II | 8 | $ 1,325.57 |
| Unknown Carrier & Model | 50 | $ 16,653.33 |
| UG-Cellular - Nokia 3360 | 770 | $ 138,600.00 |
|  | 2 | $ 288.00 |

5 of 7

| Carrier & Model / Product Description | Units | Ext. Value |
|---|---|---|
| Verizon Wireless - Audiovox 8900 (Camera Phone) | 49 | $ 10,388.00 |
| Verizon Wireless - Audiovox 8910 (Camera Phone) | 53 | $ 7,838.00 |
| Verizon Wireless - Audiovox 8900 (Camera Phone) | 3 | $ 807.00 |
| Verizon Wireless - Audiovox CDM-8940 (Video Phone) | 88 | $ 27,766.98 |
| Verizon Wireless - Audiovox PC3320 PC Card | 2 | $ 578.20 |
| Verizon Wireless - Audiovox PC5740 EV-DO PC Card | 4 | $ 570.00 |
| Verizon Wireless - Audiovox XV6600 Pocket PC (Camera Phone) | 64 | $ 33,700.75 |
| Verizon Wireless - Kyocera 7135 | 6 | $ 1,560.00 |
| Verizon Wireless - Kyocera Koi / KX2 (Camera Phone) | 25 | $ 6,419.00 |
| Verizon Wireless - Kyocera KX1v SoHo | 81 | $ 10,659.13 |
| Verizon Wireless - Kyocera KX414 | 90 | $ 10,227.86 |
| Verizon Wireless - Kyocera SE47 Slider | 120 | $ 20,836.25 |
| Verizon Wireless - LG Vi-5225 | 1 | $ 210.00 |
| Verizon Wireless - LG VX3180 | 4 | $ 609.00 |
| Verizon Wireless - LG VX3200 | 14 | $ 1,780.00 |
| Verizon Wireless - LG VX4400 | 5 | $ 920.00 |
| Verizon Wireless - LG VX4500 | 25 | $ 2,938.08 |
| Verizon Wireless - LG VX4600 | 95 | $ 15,178.72 |
| Verizon Wireless - LG VX4650 | 37 | $ 5,853.00 |
| Verizon Wireless - LG VX4700 (Push to Talk) | 15 | $ 3,081.11 |
| Verizon Wireless - LG VX5000 (Camera Phone) | 37 | $ 5,706.84 |
| Verizon Wireless - LG VX6000 (Camera Phone) | 89 | $ 14,135.00 |
| Verizon Wireless - LG VX6100 (Camera Phone) | 23 | $ 3,883.21 |
| Verizon Wireless - LG VX7000 (Camera Phone) | 31 | $ 4,584.00 |
| Verizon Wireless - LG VX8100 (Video Phone) | 2,039 | $ 691,310.00 |
| Verizon Wireless - LG VX9800 (Multimedia Phone) | 9 | $ 3,225.00 |
| Verizon Wireless - Motorola C333c | 34 | $ 4,477.57 |
| Verizon Wireless - Motorola C343c | 7 | $ 729.00 |
| Verizon Wireless - Motorola E815 (Video Phone) | 189 | $ 45,960.00 |
| Verizon Wireless - Motorola RAZR V3 (Camera Phone) | 2 | $ 330.61 |
| Verizon Wireless - Motorola Razr V3c (Multimedia Phone) | 43 | $ 14,297.00 |
| Verizon Wireless - Motorola RAZR V3c Pink | 3 | $ 797.00 |
| Verizon Wireless - Motorola T300P (Push to Talk) | 27 | $ 4,055.42 |
| Verizon Wireless - Motorola T720 | 2 | $ 430.00 |
| Verizon Wireless - Motorola T730 | 20 | $ 3,635.38 |
| Verizon Wireless - Motorola V120e | 222 | $ 18,111.25 |
| Verizon Wireless - Motorola V260 | 144 | $ 19,561.27 |
| Verizon Wireless - Motorola V265 (Camera Phone) | 297 | $ 52,837.06 |
| Verizon Wireless - Motorola V276 (Camera Phone) | 315 | $ 44,255.93 |
| Verizon Wireless - Motorola V325 (Camera Phone) | 9 | $ 1,350.00 |
| Verizon Wireless - Motorola V60i | 4 | $ 962.00 |
| Verizon Wireless - Motorola V60p | 22 | $ 6,133.00 |
| Verizon Wireless - Motorola V60i | 265 | $ 35,747.85 |
| Verizon Wireless - Motorola V60P (Push to Talk) | 14 | $ 2,696.00 |
| Verizon Wireless - Motorola V710 (Camera Phone) | 385 | $ 103,848.62 |
| Verizon Wireless - Nokia 2285 | 54 | $ 6,581.33 |
| Verizon Wireless - Nokia 3585 | 20 | $ 2,352.83 |
| Verizon Wireless - Nokia 3589i | 55 | $ 6,885.00 |
| Verizon Wireless - Nokia 6010 | 2 | $ 237.00 |
| Verizon Wireless - Nokia 6015i | 652 | $ 54,485.57 |
| Verizon Wireless - Nokia 6256i (Video Phone) | 170 | $ 37,398.30 |
| Verizon Wireless - Novatel V620 EV-DO PC Card | 4 | $ 1,033.62 |
| Verizon Wireless - PalmOne Treo 600 (Camera Phone) | 4 | $ 1,431.99 |
| Verizon Wireless - PalmOne Treo 650 (Camera Phone) | 20 | $ 9,929.97 |
| Verizon Wireless - PalmOne Treo 700w (Multimedia Phone) | 4 | $ 2,400.00 |
| Verizon Wireless - RIM Blackberry 7130e | 5 | $ 2,087.00 |
| Verizon Wireless - RIM Blackberry 7250 | 2 | $ 900.00 |
| Verizon Wireless - Samsung A310 | 51 | $ 7,106.00 |
| Verizon Wireless - Samsung A530 | 10 | $ 1,750.00 |
| Verizon Wireless - Samsung A610 (Camera Phone) | 69 | $ 12,563.64 |
| Verizon Wireless - Samsung A630 | 77 | $ 15,011.00 |

Ex.17

| Carrier & Model / Product Description | Units | | Ext. Value |
|---|---|---|---|
| Verizon Wireless – Samsung A650 | 46 | $ | 6,439.53 |
| Verizon Wireless – Samsung A670 (Camera Phone) | 25 | $ | 4,910.75 |
| Verizon Wireless – Samsung A850 (Camera Phone) | 15 | $ | 2,958.54 |
| Verizon Wireless – Samsung A880 (Video Phone) | 27 | $ | 6,225.20 |
| Verizon Wireless – Samsung A950 (Video Phone) | 5 | $ | 1,522.00 |
| Verizon Wireless – Samsung A970 (Video Phone) | 2 | $ | 624.00 |
| Verizon Wireless – Samsung i600 Smartphone | 3 | $ | 1,852.00 |
| Verizon Wireless – Samsung i730 Pocket PC | 44 | $ | 30,536.00 |
| **Total** | **42,862** | **$** | **3,999,016.50** |

11

# EXHIBIT B

VENDOR SUBSCRIPTION AGREEMENT

THIS AGREEMENT is made as of the 30ᵗʰ day of June 2006, by and between, InPhonic, Inc., a Delaware corporation ("Purchaser") and Icon International, Inc., a Connecticut corporation ("Icon").

WITNESSETH:

WHEREAS, Icon and various of its subsidiaries are engaged in the business of, among other things, procuring media advertising for customers; and

WHEREAS, Purchaser desires to purchase certain media advertising;

NOW THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally and equitably to be bound, hereby agree as follows:

1.     Agreement of Purchaser.   Purchaser hereby agrees to purchase media advertising upon terms, conditions, prices and Minimum Credit Ratios (as defined below) mutually agreed upon in advance in writing by Purchaser and Icon (collectively, "Media Advertising") in an aggregate amount sufficient to extinguish Purchaser's Minimum Payment obligations set forth in Section 7 below.

2.     Agreement of Icon.   Icon agrees to use reasonable efforts to sell the Media Advertising to Purchaser. Purchaser, in consultation with Icon, will develop a media plan (the "Plan"). Icon shall create and forward to the Purchaser a media placement schedule (the "Media Schedule") from the Plan.   Upon Purchaser providing to Icon written approval of the Media Schedule, Icon shall place such Media Schedule with those third party media providers, as approved by Purchaser.

3.     Term.   The term of this Agreement (the "Term") shall commence as of the date first above written (the "Effective Date") and shall end on March 31, 2007 (the "Expiration Date").

4.     Payment Procedures.

(a)     Purchaser shall pay to Icon the purchase price for the Media Advertising in an aggregate amount sufficient to extinguish Purchaser's Guaranteed Minimum Payment obligations as set forth in Section 7 below (the "Purchase Price").     All purchases hereunder shall be non-commissionable. Purchaser shall purchase a sufficient amount of Media Advertising such that the total Guaranteed Minimum Credits accrued shall equal $4,550,000.00 (as such amount may be increased pursuant to Section 7(f) below).

(b)     Purchases of Media Advertising pursuant to Section 4(a) will generate Guaranteed Minimum Credits (as defined in Section 7(a)(iv) hereof) which are credited against Guaranteed Minimum Payments (as defined in Section 7(a)(v) hereof) in arriving at Purchaser's Minimum Payment obligations pursuant to Section 7(b) hereof.

(c)     Payment for the Media Advertising shall be made to Icon as follows:

– 1 –

(i)      Icon will submit to Purchaser invoices that shall provide for Purchaser to pay Icon on the final business day of the month in which the Media Advertising is scheduled to run. Purchaser shall pay each invoice in full on the final business day of the month in which such Media Advertising was scheduled to run. Upon receipt by Icon of the applicable proof of performance with respect to any Media Advertising placed hereunder, Icon shall compare the media run against the order. At such time, any necessary adjustments will be made as mutually agreed upon by the parties and a new invoice shall be generated indicating any additional amounts due to Icon or any credit due to Purchaser with respect to such Media Advertising. Notwithstanding anything to the contrary contained herein, Icon retains the right to determine and modify payment terms with respect to Purchaser at any time in accordance with Icon's standard credit policies and procedures in the event of a material adverse change to the business, financial condition or future prospects of Purchaser.

(ii)     If payment of any amounts due hereunder are not paid on time or when due and payable in strict accordance with the terms and conditions of this Agreement, Purchaser shall pay interest at the [prime rate (as quoted by JP Morgan Chase Bank), plus 3% (or, if less, the] maximum rate allowed by law) on any and all unpaid balances due hereunder.

(iii)    Purchaser shall be required to pay on demand any and all reasonable attorneys' fees and costs of collection incurred by Icon in connection with collecting any delinquent amounts due from Purchaser hereunder.

(iv)    Without limiting the generality or effect of any other provision hereof, the obligation of Purchaser to pay each invoice, on an individual transaction by transaction basis, shall be absolute and unconditional, and not subject to any offset or recoupment right or any other defense or counterclaim which Purchaser may have against Icon, the applicable media advertising provider or any other person or entity now or in the future either hereunder or otherwise.

(v)     Upon the occurrence of a Purchaser Default as set forth in Section 10 below, the payment and credit terms set forth in this Section 4(c) shall no longer apply and thereafter Purchaser shall be required to deliver the price for Media Advertising to Icon prior to the ordering of any of such Media Advertising. In addition, any issued and unpaid invoices not yet due under this Section 4(c) at the time of the occurrence of such Purchaser Default or determination shall become immediately due and payable.

(vi)    All payments by Purchaser shall be by check or wire transfer made payable to the order of Icon International, Inc. Checks shall be addressed as follows: Icon International, Inc., P.O. Box 533191, Atlanta, GA 30310-3191. Wire transfers shall be sent as follows: Chase Manhattan Bank, One Chase Manhattan Plaza, New York, NY 10081, ABA # 021000021, for the account of Icon International, Inc., account # 910 2 737773.

(d)    In the event Purchaser shall utilize the services of an agent in connection with the payment of Icon invoices, Purchaser shall remain liable to Icon pursuant to the terms of this Agreement until such agent has fully performed Purchaser's payment

- 2 -

obligations hereunder. Icon shall have no obligation to pay any agency commission, service or brokers commissions, sales and use taxes, freight or delivery charges or any other similar add on fees in connection with the provision of Media Advertising or Additional Goods and Services (as hereafter defined) to Purchaser pursuant to this Agreement.

5.      <u>Obligations and Acknowledgements of Icon</u>.

(a)      Icon hereby acknowledges and agrees that all advertisements and other material to be used in connection with the Media Advertising (collectively, the "Advertisements") furnished by Purchaser constitute the property of Purchaser and that Icon shall have no claim, right, or proprietary interest in or to any intellectual property of Purchaser, including but not limited to, any designs, patents, or trademarks pertaining to the goods and/or services of Purchaser, including any and all packaging, labels and logos, as well as any copyrighted material contained in the Advertisements arising out of the services rendered to Purchaser hereunder.

(b)      Icon acknowledges and agrees that all media broadcasts or publications secured under the terms of this Agreement shall be free and clear of all liens, conflicting claims or encumbrances imposed by it.

(c)      For any Media Advertising placed hereunder, Icon shall forward to Purchaser, promptly after receipt by Icon, applicable proof of performance (affidavits of performance provided to Icon by the media providers or other independently verifiable information reasonably requested by Purchaser).

6.      <u>Obligations and Acknowledgements of Purchaser</u>.

(a)      Icon does not traffic the Media Advertising purchased hereunder. Accordingly, Purchaser shall furnish the Advertisements to the respective media providers sufficiently in advance of the scheduled use to permit the commitments hereunder to be fulfilled in the ordinary course of business.

(b)      Purchaser acknowledges and agrees that Purchaser shall be solely responsible for the content of each and every Advertisement and shall defend, indemnify and hold Icon and its affiliates harmless from and against any and all claims, demands, damages, losses, liabilities, expenses, actions or causes of action (including reasonable attorneys' fees) arising out of the Advertisements or any claims of infringement or violation of any third party's copyright, patent, trademark or other property right in connection with the Advertisements.

(c)      Purchaser understands that, if Purchaser cancels previously approved and placed Media Advertising, Icon may experience damage in its relationships with its vendors. Accordingly, should Purchaser cancel or fail to complete any Media Advertising after the same has been approved and ordered, for any reason other than the fault of Icon, Purchaser shall reimburse Icon for any direct out-of-pocket costs or expenses with respect to such canceled Media Advertising. The reimbursements hereunder are due and payable to Icon, without offset, within thirty (30) days of Purchaser's receipt of the itemized accounting of such expenditures by Icon.

- 3 -

(d)    During the Term of this Agreement, Purchaser shall require its internal marketing department, as well as its advertising agency, to reasonably cooperate with and assist Icon in the placement of Media Advertising hereunder.

(e)    Purchaser acknowledges that any direct contact between Purchaser and any media providers Icon is working with on Purchaser's behalf with respect to any proposed purchase of Media Advertising hereunder will significantly reduce Icon's ability to deliver such Media Advertising to Purchaser.

(f)    During the Term of this Agreement, Purchaser shall not enter into any barter agreements (defined specifically as a transaction involving the Purchaser (i) selling an asset to a corporate barter company, and (ii) purchasing media advertising from a corporate barter company) or related transactions with any corporate barter company other than Icon. Icon acknowledges and agrees that Purchaser barters with its original equipment manufacturers and carrier partners, neither of which is a corporate barter company for the purposes of this Section 6(f).

7.    <u>Guaranteed Minimum Payments.</u>

(a)    For purposes of this Agreement, the following definitions shall apply:

(i)    "Agreement Period" shall mean (A) June 3Q, 2006, through December 31, 2006, and (B) January 1, 2007, through March 31, 2007.

(ii)    "Reconciliation Dates" shall mean (A) December 31, 2006, and (B) March 31, 2007.

(iii)    "Carryover Minimum Credits" are determined for each Reconciliation Date hereunder and mean (A) zero with respect to the first Reconciliation Date, and (B) for each particular Reconciliation Date thereafter means the amount, if any, by which the sum of Guaranteed Minimum Credits applicable to the immediately preceding Reconciliation Date plus Carryover Minimum Credits (as previously determined) applicable to the immediately preceding Reconciliation Date exceed the Guaranteed Minimum Payment for such immediately preceding Reconciliation Date.

(iv)    "Guaranteed Minimum Credits" for any Media Advertising purchased shall be equal to the Purchase Price of such Media Advertising multiplied by the Minimum Credit Ratio for such Media Advertising type. Guaranteed Minimum Credits are applicable as and when the related Purchase Price is actually paid by Purchaser and are applicable for purposes hereof to the Reconciliation Date which immediately follows the date of such payment.

(v)    "Guaranteed Minimum Payment" shall mean (A) $3,500,000.00 for the December 31, 2006 Reconciliation Date, and (B) $1,050,000.00 for the March 31, 2007 Reconciliation Date.

(vi)    "Minimum Credit Ratio" for any Media Advertising purchased hereunder shall be mutually agreed upon in advance in writing by Icon and Purchaser.

- 4 -

(vii)    "Minimum Payment" for a particular Reconciliation Date shall mean the Guaranteed Minimum Payment for such Reconciliation Date less (i) the Guaranteed Minimum Credits applicable with respect to such Reconciliation Date and (ii) any Carryover Minimum Credits applicable with respect to such Reconciliation Date.

(b)    Purchaser agrees that, on each Reconciliation Date, Purchaser will pay the Minimum Payment due with respect to such Reconciliation Date to Icon regardless of the reason that Guaranteed Minimum Credits have not been accumulated in an amount sufficient to eliminate such Minimum Payment.  Notwithstanding anything to the contrary contained herein, in the event Icon commits an Icon Delivery Default (as defined below) in any Agreement Period in which a Minimum Payment is due, Purchaser shall not be required to pay any portion of such Minimum Payment that would have been extinguished had no such Icon Delivery Default occurred in such Agreement Period.

(c)    In the event that Purchaser is required to make a Minimum Payment pursuant to subparagraph (b) hereof, Purchaser shall be entitled to a credit in the amount of such Minimum Payment for any Agreement Period thereafter, if ever, in which the total of all Guaranteed Minimum Credits from Media Advertising purchases during such Agreement Period exceeds the total of the Guaranteed Minimum Payment required to be made hereunder for such Agreement Period.  Such credit may be used as follows: After Purchaser has made sufficient Media Advertising purchases in an Agreement Period to generate Guaranteed Minimum Credits equal to the Guaranteed Minimum Payment for such Agreement Period, then for all additional Media Advertising purchases thereafter for such Agreement Period, Purchaser shall be entitled to use Minimum Payments previously made as a credit toward the applicable Minimum Credit Ratio multiplied by the purchase price for any such Media Advertising purchases.  The amount of credits available for all Agreement Periods in the aggregate shall not exceed the total Minimum Payments made. In the event Purchaser is required to make a Minimum Payment in the final Agreement Period of this Agreement, Purchaser shall be entitled to use such Minimum Payment as a credit toward the purchase price multiplied by the applicable Minimum Credit Ratio for any Media Advertising purchased by Purchaser pursuant to the terms and conditions of this Agreement for a period of three years from the Expiration Date of this Agreement. Except as provided in this Section 7(c), under no circumstances shall Purchaser be entitled to a credit for any Minimum Payments made.

(d)    Purchaser's obligation to pay the Purchase Price for Media Advertising that has been ordered by Purchaser, but not paid for by Purchaser, shall be and remain an obligation of Purchaser independent of and in addition to any Minimum Payments due.

(e)    Except as set forth in Section 7(b) above, Purchaser's obligation to pay the Minimum Payments is and shall remain absolute, unconditional and irrevocable, regardless of the reason or reasons that Purchaser does not acquire or take delivery of any or all of the Media Advertising.  Without limiting the generality or effect of the foregoing and notwithstanding any other provision hereof or of general contract or equitable principles, whether or not to induce any third party to pay a purchase price, or to provide loans or other financial accommodations to Icon, and thereby assist Icon in providing the Media Advertising to Purchaser, Purchaser irrevocably acknowledges and agrees that (i) in furtherance hereof, Purchaser agrees to limit its rights and remedies as more fully described in Section 11(b) below, and (ii) Purchaser will indemnify, defend and hold Icon, and its successors and assigns harmless, from and against any and all

- 5 -

losses, costs, liabilities or expenses (including without limitation attorneys' fees and expenses) suffered or incurred by any of them by reason of the failure by Icon to receive the Minimum Payments that are due and payable pursuant to the terms of this Agreement. Purchaser is a substantial and sophisticated company that has carefully read the provisions of this Section 7, understands them and represents and warrants that they constitute its valid, binding and enforceable obligations and that such obligations are absolute and unconditional without regard to any act or failure to act by any person or entity.

(f)    (i) Notwithstanding anything to the contrary contained herein, in the event Purchaser has earnings before interest, taxes, depreciation and amortization ("EBITDA") in excess of zero dollars ($0.00) and cash on hand in the minimum amount of $50,000,000.00, as of December 31, 2006, as evidenced by an officer's certificate executed by the Chief Financial Officer and the Chief Executive Officer of the Purchaser reasonably estimating in good faith that the minimum EBITDA and cash on hand thresholds set forth in this Section 7(f)(i) shall be met for the twelve (12) months ending December 31, 2006, accompanied by an unaudited balance sheet and income statement of the Purchaser for the eleven (11) months ending November 30, 2006, all of which shall be delivered to Purchaser on or before December 20, 2006, upon written request from Purchaser received by Icon on or before December 20, 2006, Icon may, in its sole discretion, elect to extend the Agreement Period ending December 31, 2006 and the corresponding December 31, 2006 Reconciliation Date to June 30, 2007. In such event, Purchaser shall not be required to make the December 31, 2006 Minimum Payment until June 30, 2007 and the Guaranteed Minimum Payment for the Reconciliation Date extended to June 30, 2007, shall be increased by an amount equal to the Minimum Payment that would have been due on December 31, 2006, but for Icon agreeing to extend such Reconciliation Date, multiplied by 104%. (ii) In addition, notwithstanding anything to the contrary contained herein, in the event Purchaser has EBITDA in excess of zero dollars ($0.00) and cash on hand in the minimum amount of $50,000,000.00, as of March 31, 2007, as evidenced by an officer's certificate executed by the Chief Financial Officer and the Chief Executive Officer of the Purchaser reasonably estimating in good faith that the minimum EBITDA and cash on hand thresholds set forth in this Section 7(f)(ii) shall be met for the three (3) months ending March 31, 2007, accompanied by an unaudited balance sheet and income statement of the Purchaser for the two (2) months ending February 28, 2007, all of which shall be delivered to Purchaser on or before March 20, 2007, upon written request from Purchaser received by Icon on or before March 20, 2007, Icon may, in its sole discretion, elect to extend the Agreement Period ending March 31, 2007 and the corresponding March 31, 2007 Reconciliation Date to September 30, 2007. In such event, Purchaser shall not be required to make the March 31, 2007 Minimum Payment until September 30, 2007 and the Guaranteed Minimum Payment for the Reconciliation Date extended to September 30, 2007, shall be increased by an amount equal to the Minimum Payment that would have been due on March 31, 2007, but for Icon agreeing to extend such Reconciliation Date, multiplied by 104%.

8.    Additional Goods and Services. Purchaser may, from time to time request that Icon assist Purchaser in the purchase of non-media goods and services (collectively, the "Additional Goods and Services"). Upon the mutual agreement of Purchaser and Icon, Icon may provide Purchaser with Additional Goods and Services upon prices, specifications, terms and conditions (including the Minimum Credit Ratio for such

Additional Goods and Services) mutually agreed upon in advance, in writing, by the parties hereto.

9.  Representations and Warranties.

(a)  Icon hereby represents and warrants to Purchaser that:

(i)  Incorporation/Corporate Power. Icon is duly organized and validly existing under the laws of the state of Connecticut and has the capacity to enter into this Agreement, and the execution and delivery of this Agreement have been duly authorized by Icon;

(ii)  No Restrictions or Prohibitions. Icon is not subject to any restriction, contractual or otherwise, which prevents it from entering into and carrying out its obligations under this Agreement, and neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will constitute a violation or default of any term or provision of any contract, commitment, indenture or other agreement or restriction (including statutory, regulatory, administrative, or judicial restrictions) to which Icon is a party or is otherwise subject;

(iii)  No Required Filings. No authorization, consent, approval, license, exemption of or filing or registration with any court or governmental authority or regulatory body is required of Icon for the due execution, delivery or performance by Icon of this Agreement, except for any such authorizations, consents, approvals, licenses, exemptions, filings or registrations the failure of which to be obtained would not (x) have a material adverse effect on the business, financial condition or future prospects ("Material Adverse Effect") of Icon or (y) be reasonably expected to impair the ability of Icon to perform its obligations under this Agreement;

(iv)  Enforceability. This Agreement constitutes a legal, valid and binding obligation of Icon, enforceable against Icon in accordance with its terms, except to the extent that such enforceability may be limited by the laws now or hereafter in effect, affecting generally the enforcement of creditors' rights, and except to the extent that the availability of the remedy of specific performance or injunctive relief is subject to general principles of equity or the discretion of the court before which any proceeding therefor may be brought;

(v)  Solvency. Both before and after giving effect to the transactions contemplated in this Agreement, Icon's assets have a fair market value in excess of its total liabilities, it has sufficient current assets to pay its current liabilities as they become due and matured, and it has, and will continue to have, access to adequate capital for the conduct of its business;

(vi)  Licenses and Permits. Icon holds all licenses, permits and other certificates required for the operation of its business, except for those licenses, permits and other certificates where the failure to hold such documents would not have a Material Adverse Effect on Icon. Icon is in compliance, in all material respects, with all applicable state and federal laws and regulations; and

- 7 -

(vii)  <u>Legal Proceedings</u>.  There are no legal proceedings or investigations pending or, to the best of Icon's knowledge, threatened against Icon before any court, tribunal or regulatory authority which could, if adversely determined, alone or together with any other proceedings, have a Material Adverse Effect on Icon or be reasonably expected to impair the ability of Icon to perform its obligations under this Agreement.

(b)  Purchaser hereby represents and warrants to Icon that:

(i)  <u>Incorporation/Corporate Power</u>.  Purchaser is duly organized and validly existing under the laws of the state of its incorporation and has the capacity to enter into this Agreement, and the execution and delivery of this Agreement has been duly authorized by Purchaser;

(ii)  <u>No Restrictions or Prohibitions</u>.  Purchaser is not subject to any restriction, contractual or otherwise, which prevents it from entering into and carrying out its obligations under this Agreement, and neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will constitute a violation or default of any term or provision of any contract, commitment, indenture, or other agreement or restriction (including statutory, regulatory, administrative, or judicial restrictions) to which Purchaser is a party or is otherwise subject;

(iii)  <u>No Required Filings</u>.  No authorization, consent, approval, license, exemption of or filing or registration with any court or governmental authority or regulatory body is required of Purchaser for the due execution, delivery or performance by Purchaser of this Agreement, except for any such authorizations, consents, approvals, licenses, exemptions, filings or registrations the failure of which to be obtained would not (x) have a Material Adverse Effect on the Purchaser or (y) be reasonably expected to impair the ability of Purchaser to perform its obligations under this Agreement;

(iv)  <u>Enforceability</u>.  This Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except to the extent that such enforceability may be limited by the laws now or hereafter in effect, affecting generally the enforcement of creditors' rights and, except to the extent that the availability of the remedy of specific performance or injunctive relief is subject to general principles of equity or the discretion of the court before which any proceeding therefor may be brought;

(v)  <u>Solvency</u>.  Both before and after giving effect to the transactions contemplated in this Agreement, Purchaser's assets have a fair market value in excess of its total liabilities, it has sufficient current assets to pay its current liabilities as they become due and matured, and it has, and will continue to have, access to adequate capital for the conduct of its business;

(vi)  <u>Licenses and Permits</u>.  Purchaser holds all licenses, permits and other certificates required for the operation of its business, except for those licenses, permits and other certificates where the failure to hold such documents would not have a Material Adverse Effect on Purchaser.  Purchaser is in

- 8 -

compliance in all material respects with all applicable state and federal laws and regulations; and

(vii)    <u>Legal Proceedings</u>.    There are no legal proceedings or investigations pending or, to the best of Purchaser's knowledge, threatened against Purchaser before any court, tribunal or regulatory authority which could, if adversely determined, alone or together with any other proceedings, have a Material Adverse Effect on Purchaser or be reasonably expected to impair the ability of Purchaser to perform its obligations under this Agreement.

10.    <u>Default</u>.

(a)    <u>Purchaser's Default</u>. Purchaser shall notify Icon immediately upon the existence of any of the following, each, a "Purchaser Default:"

(i)    Except as set forth in Section 7(b) above, Purchaser shall fail to pay all or any portion of any Minimum Payment, on any of the applicable Reconciliation Dates (as the same may be extended pursuant to Section 7(f) above);

(ii)    Purchaser shall fail to comply with any of its covenants set forth in this Agreement;

(iii)    Purchaser shall fail to perform any material terms or agreements contained in this Agreement or in any other document or instrument executed or delivered or incorporated by reference as part of this Agreement, including Purchaser's obligation to pay the Purchase Price for Media Advertising provided pursuant to this Agreement, on the payment terms set forth in Section 4 above;

(iv)    Any representation or warranty of Purchaser in this Agreement or in any other document or instrument executed or delivered in connection herewith, including without limitation the certificates of the Chief Financial Officer and Chief Executive Officer of the Purchaser set forth in Section 7(f) of the Agreement, shall have been false in any material respect on the date when made or deemed to have been made or repeated;

(v)    Purchaser shall be in default under any other agreements Purchaser may now or hereafter have with Icon;

(vi)    There shall occur a change in Purchaser's business, financial condition, results of operations or prospects which has had or could reasonably be expected to have a Material Adverse Effect on Purchaser;

(vii)    Purchaser shall make an assignment for the benefit of creditors, or admit in writing its general inability to pay or generally fail to pay its debts as they mature or become due, or shall petition or apply for the appointment of a trustee or other custodian, liquidator or receiver of Purchaser or of any substantial part of Purchaser's assets or shall commence any case or other proceeding relating to Purchaser under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation or

similar law of any jurisdiction, now or hereafter in effect, or shall take any action to authorize or in furtherance of any the foregoing, or if any such petition or application shall be filed or any such case or other proceeding shall be commenced against Purchaser; and

(viii)    Notwithstanding the foregoing, a "Purchaser Default" shall not be deemed to have occurred under subsections: (a) 10(a)(i), (ii) or (iii) involving a payment of money, unless Purchaser shall fail to pay to Icon all or any portion of a payment when due, and such failure shall not be cured within ten (10) business days of the date Purchaser first receives written notice of such failure from Icon; and (b) 10(a)(ii) or (iii) with respect to any failure by Purchaser thereunder not involving a payment of money, unless such failure shall not be cured by Purchaser within thirty (30) days after Purchaser first has notice of such failure (or if such failure cannot reasonably be cured within thirty (30) days, then for such longer period not to exceed an additional sixty (60) days as shall be required to cure such failure), provided, however, that Purchaser shall at all times be diligently attempting to cure such failure.

(b)    After the occurrence of a Purchaser Default, all of Purchaser's obligations to Icon, including any unpaid portion of the Minimum Payments, shall bear interest at a fixed rate per annum equal to the lesser of (i) the prime rate (as quoted by JP Morgan Chase Bank), plus 3%, or (ii) the highest or maximum rate of interest permissible to be charged for transactions of this type under the laws of the State of Connecticut. Any amount paid in excess of such rate shall be considered to have been payments in reduction of the amount of the outstanding Minimum Payments.

(c)    Icon Default.    Icon shall notify Purchaser immediately upon the existence of any of the following, each, an "Icon Default:"

(i)    Icon shall fail to comply with any of its covenants set forth in this Agreement;

(ii)    Icon shall fail to perform any terms or agreements contained in this Agreement or in any other document or instrument executed or delivered in connection herewith;

(iii)    Any representation or warranty of Icon in this Agreement or in any other document or instrument executed or delivered in connection herewith, shall have been false in any material respect on the date when made or deemed to have been made or repeated;

(iv)    Icon shall commit an Icon Delivery Default. For the purposes of this Agreement, an "Icon Delivery Default" shall be deemed to have occurred hereunder if Icon shall have failed in any material respect to comply with its obligations hereunder to deliver Media Advertising requested by Purchaser, and such failure shall have not been cured within fifteen business (15) days after Icon has received written notice from Purchaser of such failure;

(v)    Icon shall be in default under any other agreements Icon may now or hereafter have with Purchaser;

- 10 -

(vi)    Icon shall make an assignment for the benefit of creditors, or admit in writing its general inability to pay or generally fail to pay its debts as they mature or become due, or shall petition or apply for the appointment of a trustee or other custodian, liquidator or receiver of Icon or of any substantial part of Icon's assets or shall commence any case or other proceeding relating to Icon under any bankruptcy, reorganization, arrangements, insolvency, readjustment of debt, dissolution or liquidation or similar law of any jurisdiction, now or hereafter in effect, or shall take any action or authorize or in furtherance of any the foregoing, or if any such petition or application shall be filed or any such case or other proceeding shall be commenced against Icon; and

(v)    Notwithstanding the foregoing, an "Icon Default" shall not be deemed to have occurred under subsections 10(c)(i) or (ii) with respect to any failure by Icon thereunder not involving a payment of money, unless such failure shall not be cured by Icon within thirty (30) days after Icon first has notice of such failure (or if such failure cannot reasonably be cured within thirty (30) days, then for such longer period not to exceed an additional sixty (60) days as shall be required to cure such failure); provided, however, that Icon shall at all times be diligently attempting to cure such failure.

11.    Remedies.

(a)    Icon Remedies.  Upon the occurrence of a Purchaser Default, Icon may, at its option, and upon notice to or demand upon Purchaser, declare all Minimum Payments to be immediately due and payable in full, whereupon Icon's obligations hereunder, including without limitation Icon's obligation to use reasonable efforts to supply the Media Advertising, shall thereupon terminate, and Icon shall have no further obligations to Purchaser under this Agreement.  After the occurrence of a Purchaser Default, Purchaser shall pay to Icon, within ten (10) business days following demand, any direct, out-of-pocket costs of collection incurred by Icon.  Such costs of collection shall include, but not be limited to, all costs and expenses, including reasonable attorney's fees and expenses, incurred or expended by Icon in connection with (i) the preservation, attempted collection or collection of any of Purchaser's obligations to Icon, including the outstanding amount of the Minimum Payments, or the preservation or enforcement of any other rights or remedies of Icon against the Purchaser, including without limitation any negotiations for the resolution of any dispute and the costs incurred by Icon in connection with any arbitration proceedings, and (ii) any litigation or arbitration proceedings or other dispute, resolution proceedings relating, directly or indirectly, to this Agreement.

(b)    Purchaser's Remedies.  Purchaser's remedies for an Icon Default shall be limited as follows:

(i)    In the event of an Icon Delivery Default, on the Reconciliation Date ending the Agreement Period in which such Icon Delivery Default occurred, Purchaser shall not be required to pay the portion of the Minimum Payment, if any, that would have been extinguished had no such Icon Delivery Default occurred in such Agreement Period.  For example, in the event Icon commits an Icon Delivery Default with respect to Media Advertising with a purchase price of $1,000,000.00 and a Minimum Credit Ratio of twenty percent (20%), and in the Agreement Period in which Icon committed such Icon Delivery Default, Purchaser's purchases of Media Advertising have generated $250,000.00 in

- 11 -

Guaranteed Minimum Credits less than would have been required to extinguish Purchaser's Minimum Payment obligation for such Agreement Period, Purchaser shall make a Minimum Payment in the amount of $50,000.00 and shall not be required to pay the $200,000.00 portion of the Minimum Payment that would have been extinguished in the absence of such Icon Delivery Default. Except as provided in this Section 11(b)(i), no breach, default, act (including wrongful, fraudulent, arbitrary, capricious, reckless and negligent act), shall relieve or excuse Purchaser from its obligation to make the Minimum Payment with respect to such Agreement Period. Purchaser expressly acknowledges and agrees that Icon's rights to the Minimum Payments are freely assignable and that Purchaser's obligations to make the Minimum Payments, except in the event of any Icon Delivery Default, shall not be subject to any rights of setoff or recoupment, or subject to any counterclaim or defense which Purchaser may claim to have, and Purchaser agrees that in any legal or equitable proceeding to enforce this Agreement against Purchaser, Purchaser shall not interpose any such claim for setoff or recoupment or attempt to avoid its obligation to make the Minimum Payments, in whole or in part, by way of defense or counterclaim.

(ii)    Any cause of action that Purchaser may have arising out of, in whole or part, Icon's failure to perform under this Agreement, is reserved to Purchaser, provided, however, that Purchaser may not assert any such claim or cause of action as a setoff or recoupment, defense or counterclaim to the Purchaser's obligation to make the Minimum Payments, except in the event of any Icon Delivery Default as set forth in Section 11(b)(i) above; but rather Purchaser may only assert such claim or cause of action against Icon in an action that is separate and independent from any action to recover the Minimum Payments.

(iii)    Nothing herein shall preclude or prohibit Purchaser from bringing a cause of action against Icon to recover damages suffered or incurred by Purchaser as a result of Icon's breach of this Agreement or failure to perform its obligations hereunder; provided, however, that such causes of action shall be independent of Purchaser's obligation to make the Minimum Payments, except in the event of an Icon Delivery Default as set forth in Section 11(b)(i) above, and Purchaser shall have no offset or similar rights or defense with respect thereto as more particularly provided in Sections 11(b)(i) and (ii) and 4(c)(v) hereof.

12.    Assignment.    This Agreement shall become effective when it shall have been executed by Icon and Purchaser and thereafter shall be binding upon, inure to the benefit of and be enforceable by Icon and Purchaser, and their respective permitted successors and assigns. Purchaser may assign any or all of its rights or interest, but not its obligations, under this Agreement, without the consent of any other party. However, it is understood and agreed that upon reasonable advance notice from Purchaser to Icon, any entity wholly owned by Purchaser shall have the right with Purchaser's consent, to identify and purchase under the terms hereof Media Advertising from Icon hereunder conforming to the Specifications and that any such purchases shall count towards satisfaction of Purchaser's obligations respecting the Purchase Price and Minimum Payments. Any assignment in violation of this Agreement shall be void.

13.    Miscellaneous

- 12 -

(a)    Binding Arbitration.  All claims, disputes and other matters in questions among the parties arising out of or relating to this Agreement, or the breach thereof, shall be decided by final and binding arbitration as provided in this Section 13.  Arbitration shall be conducted in New York, New York under the Commercial Arbitration Rules of the American Arbitration Association.  There shall be a single arbitrator appointed by mutual agreement of the parties.  If the parties are unable to agree upon an arbitrator, there shall be three arbitrators appointed in accordance with the rules of the American Arbitration Association.  The arbitrators shall award reasonable attorneys' fees to the prevailing party or parties, (or, if no party prevails in full, the arbitrator may award reasonable attorneys' fees based upon the extent to which the arbitrator determines that one or more of the parties prevailed).  The arbitrators may not award consequential or punitive damages.  The decision and award of a majority of the arbitrators may be entered as a judgment in any court of competent jurisdiction.  Except as otherwise provided in this Agreement, the parties shall rely solely on the procedures set forth herein to resolve any claim, dispute or other matter arising out of or relating to this Agreement, or the breach thereof.  If any party to this Agreement files an action in court in violation of this Agreement, that party shall indemnify the other parties for their costs and counsel fees incurred as a result of such violation.

(b)    Notices.  All notices required to be given pursuant to this Agreement shall be deemed given when actually delivered personally, by overnight courier or three days after being deposited in the United States mail service, postage prepaid and addressed to the receiving party as follows:

    For Icon:      Icon International, Inc.
                   107 Elm Street/4 Stamford Plaza
                   Stamford, Connecticut 06902
                   Attn: Mr. John Kramer, President

    For Purchaser: InPhonic, Inc.
                   1010 Wisconsin Avenue, NW, Suite 600,
                   Washington, DC 20007
                   Attn: Chief Financial Officer

                   With a copy to General Counsel at the same address

(c)    Severability.  The invalidity, illegality or unenforceability of any provisions of this Agreement shall not affect the validity, legality or enforceability of the remaining provisions of this Agreement.

(d)    Waiver.  Any waiver (whether express or implied) by any party hereto of the breach of any term or condition of this Agreement shall not constitute a waiver of any subsequent breach of the same or other term or condition of this Agreement.

(e)    Governing Law; Jurisdiction.  This Agreement shall be interpreted in its entirety in accordance with the laws of the State of New York.  Each of Icon and Purchaser hereby submit to the exclusive jurisdiction of the state or federal courts resident in the State of New York for purposes of enforcing any arbitration award or resolving any disputes arising under this Agreement.

- 13 -

     (f)    No Joint Venture. Nothing contained herein shall be construed to constitute or deem either party as a partner, joint venturer, employee, associate or agent of the other.

     (g)    Entire Agreement. This Agreement is the entire agreement between the parties relating to the subject matter hereof and supersedes all prior agreements, proposals, letters of intent, representations and commitments. This Agreement may be amended only by an instrument executed by the authorized representative of all parties.

     (h)    Confidentiality. Both Purchaser and Icon acknowledge that during the Term of this Agreement, each party may obtain access to confidential and proprietary information, trade secrets, customer lists, media information, media pricing and financial information (the "Confidential Information") of the other party. The parties acknowledge that each party would be irreparably damaged by the disclosure of the Confidential Information to others. Therefore, the parties agree to keep secret and confidential and not to disclose the Confidential Information of each other without the prior written consent of the other party. The parties' agreement not to disclose the Confidential Information shall survive the expiration of this Agreement.

     (i)    Counterparts; Facsimile. This Agreement may be executed in one or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one agreement binding on all parties hereto, notwithstanding that all of the parties are not signatory to an original or same counterpart. The parties may execute and deliver this Agreement by facsimile transmission.

     (j)    Authority to Execute. Each person executing this Agreement represents and warrants that it is duly authorized to execute this Agreement by the party on whose behalf it is so executing.

     (k)    Press Release. Except as required by law, in no event shall either party issue a press release or make a public announcement concerning this Agreement or the other party without first obtaining the prior written consent of the other party.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

ICON INTERNATIONAL, INC.

By: _____
Name: Clarence V. Lee III
Title: EVP/CFO

INPHONIC, INC.

By: _____
Name: David Steinberg
Title: CEO

- 15 -